IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2019

**RICKY HARRIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Carter County**
**No. 23346   James F. Goodwin, Jr., Judge**

_____

**No. E2018-00362-CCA-R3-ECN**

_____

The Petitioner, Ricky Harris, appeals the Carter County Criminal Court's denial of his petition for a writ of error coram nobis from his first degree murder conviction, for which he received a life sentence. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Kyle D. Vaughan, Kingsport, Tennessee, for the appellant, Ricky Harris.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; and Kenneth C. Baldwin, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the 1987 killing of Dolly Gouge, for which the Petitioner was charged and convicted of first degree murder. *State v. Ricky Jerome Harris*, No. 85, 1990 WL 171507 (Tenn. Crim. App. Nov. 8, 1990), *perm. app. denied* (Tenn. Feb. 4, 1991). The Petitioner appealed his conviction, and in the opinion affirming the conviction, this court summarized the facts of the case as follows:

> On September 8, 1987, Dolly Gouge, who was sixty-seven years of age at the time, lived on the Rittertown Road (old Highway 19E) in Carter County. . . . Mrs. Gouge's daughter, Laverne Ruth Gouge Harris, was, at that time, the wife of the appellant. They were separated and she lived with her mother. Laura Harris, the daughter of the appellant and Laverne, also lived there, as did Mrs. Gouge's mother, Vena Odom, who was ninety-one

years of age. Mrs. Odom lived in a small house adjacent to Mrs. Gouge's house.

Early that morning, . . . Mrs. Gouge, who took off her housecoat and pajama bottom and put on another light housecoat with the pajama top. Laverne and Laura Harris departed at 7:55 A.M. . . . .

Helen Hopson was Mrs. Gouge's sister. At about 8:00 or 8:30 every morning Mrs. Gouge called Mrs. Hopson to report on the condition of their mother. On September 8, Mrs. Hopson did not receive the usual call from her sister, so she called Mrs. Gouge's residence three times. When there was no answer, she and her husband drove to Mrs. Gouge's home to determine why her sister had not answered. When she arrived, she found the television and the lights on in the house. She searched throughout the house, including under the beds and in the closets, but could not find Mrs. Gouge. Around the flower bed near the door, Mrs. Hopson smelled an odor which reminded her of a hospital.

At 9:45 or 9:50 A.M., Mrs. Hopson notified Mrs. Harris that Mrs. Gouge was missing. Mrs. Harris went home immediately, arriving at 10:10 A.M. She called the police and her brother. She also attempted to call the appellant at his place of employment, Sherwood Chevrolet-Nissan, Inc., in Johnson City. Mrs. Harris also smelled the hospital odor near the door.

Officers responded and found Mrs. Gouge's glasses lying off the edge of the porch, and a blue woman's shoe and Mrs. Gouge's lower denture in the flower bed. The flowers were laid over and stepped on as though someone had been wrestling in the flower bed. A hair roller with hair in it was found on the sidewalk. The inside of the house was very neat. Mrs. Gouge's purse was found on the kitchen table, along with her Bible, a church record book and the keys to her car, which was parked outside her home. . . .

The appellant arrived at Mrs. Gouge's home just ahead of the police officers and was interviewed at the scene concerning what, if anything, he knew about the victim's disappearance. The appellant, who had previously lived there with his wife, daughter and mother-in-law, stated that he had been there that morning to get two of his jackets. He arrived at approximately 8:00 A.M., but received no answer when he knocked at the door. He left, drove down the road, then decided to return to get some phonograph records, but did not do so. He denied seeing Mrs. Gouge at all that day.

- 2 -

A massive search was undertaken for Mrs. Gouge. A tracking dog was brought to her home to ascertain whether she had walked away or whether she left by a vehicle. The dog handler testified that due to the inability of his dog . . . to find a track from her home, that it was his opinion Mrs. Gouge did not walk away. All efforts to locate Mrs. Gouge proved unsuccessful at that time.

On December 23, 1987, portions of a skeleton were found on a wooded hillside adjacent to the Carr Cemetery in a rural area of Washington County known as Watauga Flats. A flowered robe, identified as the one Mrs. Gouge was wearing that morning, her upper denture and hair rollers with hair matching Mrs. Gouge's were found in the area. The decayed body had been dismembered by animals and only portions of the skeleton were found. The hair from her scalp was found, as was the mate to the shoe found in the flower bed. . . . It was impossible to determine from the remains how Mrs. Gouge died.

The appellant was a suspect from the early days of the investigation. As a salesman for Sherwood Chevrolet, he drove a demonstrator automobile belonging to the dealership. Three days after Mrs. Gouge's disappearance, the appellant's employer made the car available to the police. The trunk was vacuumed and one hair was discovered which matched the hair on Mrs. Gouge's head. The appellant consented to a search of his room that he occupied at a motel. No incriminating evidence was found, although a pair of binoculars was found.

The binoculars were important because between 7:30 and 7:55 A.M. that morning four witnesses saw a man sitting in a car parked on the opposite side of the four lane highway from the victim's home looking in the direction of her home with binoculars. The car was variously described as a new or late model car, silver or light in color with stickers in the back window on the driver's side. The man in the car was variously described as fairly tall, having "kinda broad shoulders," with hair described as "brownish blonde" to "medium to dark brown." He was described as having a short hair cut and maybe a small mustache. He was said to have a medium complexion and was well dressed, wearing a white long sleeve shirt with a sport coat lying on the seat. One witness described the man as "very professional looking," and she thought she was seeing an officer in an unmarked police car.

One of the witnesses saw the same car again at approximately 8:10 to 8:15 A.M. . . . at a bridge at the interstate highway. The driver was the same individual that she had seen before and no one else was visible in the

car. Although she did not know the appellant and had been shown no photographs of him, at the trial she identified the appellant as the person she saw driving the car.

Joyce Hinkle was the victim's next door neighbor. . . . Mrs. Hinkle knew the appellant well from his having lived in the victim's home. Between 8:15 and 9:00 A.M., Mrs. Hinkle looked out and saw a light colored automobile with Sherwood Chevrolet stickers in the back driver's side window. The car was parked directly in front of the victim's driveway. She saw no one around the car. When she stepped out on her back porch, she heard Mrs. Gouge's voice give out a surprised "holler" or yell. The sound came from the front entrance of the victim's house. She heard nothing else . . . . She saw the appellant coming from the area of Mrs. Gouge's mother's house walking at a fast pace, clutching something in his hands. He went around to the front entrance of the victim's home, then came back around and seconds later he went back around the house completely out of her sight. He was wearing dark brown cotton work gloves and was clutching a bottle similar to the bottles in which Armorall is packaged.

On his second trip around the house "he stepped out in (her) face," startling both Mrs. Hinkle and the appellant. They spoke and he went on down the driveway. He got in the car and drove away . . . . A few minutes later she saw the same car going toward Roan Mountain. The appellant then drove into the victim's driveway at a fast speed. He was not wearing gloves at this time[,] and he waved to Mrs. Hinkle and said he was going to Mrs. Gouge's to get his albums. A few minutes later[,] he came back down the driveway at such a fast speed that she did not think he would be able to safely navigate the turns in the driveway. However, he was able to do so[,] and he turned on the Rittertown Road toward Roan Mountain. When she first saw him at the house the appellant was dressed in a long sleeve light colored shirt, but when he came down the driveway he was dressed in a dark colored polo shirt or T-shirt and worn blue jeans.

Nannie Stephens, another neighbor . . . , was walking to Mr. Gouge's house carrying some vegetables from her garden for Mrs. Gouge. She saw the car come out of the driveway and proceed toward Roan Mountain. She went on to the victim's house and went through the house and around it twice looking for Mrs. Gouge. She saw that the television set and the lights were on and noted that the flowers were matted down. She saw the shoe in the flower bed. She looked in on Mrs. Gouge's elderly mother, who was eating, but did not bother her. Mrs. Stephens returned

- 4 -

home and called the victim's house several times. She received no answer until . . . Mrs. Hopson, the victim's sister, had arrived . . . .

On the day of the victim's disappearance the appellant was asked to go to the sheriff's department. When he left the sheriff's department, Walter William Foster was assigned the duty of following the appellant in plain clothes, driving his personal vehicle. He followed him to the motel where the appellant was living, thence to Sherwood Chevrolet, and then to his attorney's office where Mr. Foster went in, and saw the appellant sitting in the waiting room. The appellant and his attorney came outside, opened the trunk of the car, looked in it and talked. The appellant then left, bought gas and went to a car wash . . . . He stayed there two or three minutes. However, from his vantage point, Mr. Foster could not determine whether the appellant vacuumed the car. The appellant then washed his car [and] left . . . .

Tammy Lynn Ricker, an employee of Econo Inn in Johnson City, had a conversation . . . with the appellant while he was staying there. They talked of his marital problems. Noting that she had a book on witchcraft, he wanted to know if there was anything in the book concerning getting rid of somebody. She asked if it was his mother-in-law, and the appellant shrugged his shoulders and gave no answer.

Employees of Sherwood Chevrolet noted that on the day of the victim's disappearance . . . the appellant was not seen at the dealership at the usual time. He was first seen there between 9:30 or 10:00 A.M., at which time he seemed flushed and excited, and was sweating. Lynn Postlewaite, the sales manager, noted that during that week he saw scratches on the appellant's forearm and asked if he had been "in a fight with a wildcat." The scratches, described as very deep, looked like fingernail marks that were, at best, a day or two old. The appellant said he had scratched himself while cutting bushes at his mother's house that weekend.

The Carr Cemetery Road is a dead end road that ends at the cemetery. The Carr Cemetery Road intersects the Watauga Flats Road. Charles Carr, who lived in the Watauga Flats area of Washington County, was returning from his doctor's office at about 9:00 A.M. on September 8. As he turned off the Watauga Flats Road onto the Carr Cemetery Road, he met a new gray car with a dealer's tag. The driver had a mustache and light brown hair. In the middle of the summer he had seen the same car in that area twice. On the first occasion it was moving and on the other it was parked at the cemetery.

James H. Hodge . . . saw a gray car traveling along the Carr Cemetery Road toward the cemetery between 8:30 and 9:00 A.M. on the morning of September 8. Mr. Hodge was walking to his computer room and was approximately forty feet from the car. Ten to fifteen minutes later the car came back down the road in the opposite direction at about ten miles per hour. At that time, Mr. Hodge . . . was approximately ten feet from the car. He described the car as a "new looking" gray Chevrolet with red pinstripes, a dealer's tag and new car stickers on the left rear window. He looked directly at the driver, who looked directly at him. He described the driver as a white male with brown hair and a brown to light brown mustache. He positively identified the appellant as the driver of the car. He also remembered that Mr. Carr passed him within ten seconds of the time the gray Chevrolet passed.

Shannon Morton, a detective employed by the Carter County Sheriff's Department, testified that he measured the distance from the victim's home in Carter County to the Carr Cemetery in Washington County and from the Carr Cemetery to Sherwood Chevrolet in Johnson City. From the victim's home to the cemetery, it was approximately eighteen miles. From the cemetery to the dealership, it was approximately eight and one-half miles. Driving at the speed limit, the total driving time was approximately forty-one minutes.

The appellant told conflicting stories to his . . . concerning his whereabouts on the morning of September 8 . . . . He told the sales manager when he arrived shortly after 10:00 A.M. that he had kept an appointment with his lawyer that morning. However, he had told Bill Nichols . . . that he was going to meet a man named Jim from Chicago at the Tri-Cities Airport. Allegedly Jim was to arrive on a private jet bringing a large amount of cash with him. . . .

In July 1987, the victim and the appellant had a confrontation over the appellant's marital problems with the victim's daughter. Mrs. Gouge told the appellant that "his gravy train was over" . . . , that he was no longer welcome there[,] and that she was backing her daughter in the divorce action. She told the appellant to get out and to never come back. His clothes were packed in plastic bags and placed on the front porch. His record albums were in a long box, which was also placed on the front porch. The appellant told his wife several times that Mrs. Gouge was the cause of their marital problems . . . .

The appellant testified, vehemently denying that he killed Mrs. Gouge. He admitted that he had a confrontation with her on July 17, 1987,

the date that he separated from his wife. He testified that on the morning of September 8, . . . he stopped at the Exxon service station . . . across from her house to buy gasoline and went to her house to get his jackets. He parked at a pull off at the entrance to the driveway because Mrs. Gouge had told him not to park on her property. He acknowledged seeing Mrs. Hinkle as he walked up the driveway. According to his testimony, he knocked on the door three or four times, but did not get an answer. He walked back down the driveway, got in his car and left. He decided to go back to try to get his record albums, so he turned around and went back to Mrs. Gouge's home. This time he drove up the driveway and again knocked on the door. After getting no answer, he decided to leave without getting any of his possessions.

According to the appellant, he drove directly to Sherwood Chevrolet where he arrived shortly before 9:00 A.M. After his arrival, he called the lawyer representing him in his divorce case, Michael O'Connor, to report that he had been to Mrs. Gouge's residence. After his wife called later that morning to report that her mother was missing, he returned to the Gouge residence.

The appellant admitted that Mrs. Gouge paid $10,000.00 to settle a civil suit which had been brought against him in 1985, and that she had also paid $5,000.00 to his attorneys . . . . He admitted that he had not paid any of that money back to the victim. There was also . . . testimony by the appellant concerning the financial gyrations in which he, his wife and Mrs. Gouge had been involved. He and his wife had been indicted for signing the name of a corporation not yet in existence, and he entered a plea of nolo contendre to that charge in exchange for the dismissal of the charges against his wife. They had organized other corporations; he had planned to go to Switzerland to get a million dollars to invest; he contracted to purchase property for $275,000.00 to build his corporate headquarters; borrowed $10,000.00 at a usurious interest rate to broker "high quality steam coal"; and he and his wife agreed to buy a home costing $250,000.00. He alleged that at the time of the offense, he had just returned from Orlando, Florida, where he had made ten thousand dollars "putting together (a) real estate packet for financing." Prior to that he had been a drywall finisher and did residential remodeling.

Michael O'Connor, the appellant's attorney in the divorce case, testified that he received a telephone call from the appellant at 9:15 A.M. on September 8, 1987. He did not tell him where he was calling from, but, from the background noise, he knew that the appellant was calling from Sherwood Chevrolet. Mr. O'Connor testified regarding the viewing of the

trunk at his office on the afternoon of September 8. The appellant told him that the dog had sniffed his car[,] and Mr. O'Connor suggested that they look in the trunk. . . . Mr. O'Connor and his wife had befriended the appellant in ways far exceeding what he'd done for any other client.

William Rogle and his mother, Mattie Knight, testified that they were at the Exxon service station at about 8:40 A.M. on the morning of September 8. They saw a man standing outside a car parked in the church yard adjacent to the service station with binoculars looking at the mountains. The man was *not* the appellant.

Other witnesses testified regarding a videotaped experiment that they performed on the Carr Cemetery Road with a car being driven past Mr. Hodge's property. The purpose was to show the difficulty in identifying anyone in a passing car.

In rebuttal[,] Clyde Jenkins testified as to the appellant's poor reputation for truth and veracity. . . . Michele Darlene Turk, who then worked for Sherwood Chevrolet, testified regarding the appellant's arrival at approximately 10:00 A.M. on September 8, the mud she saw on the appellant's pants leg that morning, and the fact that he changed his pants when they went to his motel room to get a road atlas. He also . . . threw away some crumpled papers. A detective was recalled to testify that the foliage was still present at that time, negating the idea that anyone would be looking at the mountains with binoculars.

. . . Ivan Lilly, the attorney for Mrs. Harris in the divorce case, testified that his office was next door to Mr. O'Connor's office. On the morning of September 8, Mr. O'Connor came over to his office between 10:15 and 10:30 to tell him that he had just talked to the appellant on the telephone. He stayed at Mr. Lilly's for quite a long time. Later that afternoon, Mr. Lilly saw a notepad on Mr. O'Connor's secretary's desk, which indicated that the appellant had called at 10:15 A.M., rather than 9:15 as Mr. O'Connor testified.

. . . Sally Settle, Mr. O'Connor's secretary, testified that the appellant called before 9:30 A.M., that she makes no notations of calls when Mr. O'Connor is present in the office and she did not remember Mr. O'Connor going to Mr. Lilly's office for an extended visit that morning.

*Id.* at *1-7.

The Petitioner unsuccessfully sought habeas corpus relief. *See Ricky Harris v. Robert Conley, Warden and State of Tennessee*, No. 02C01-9309-CC-00227, 1994 WL 510501 (Tenn. Crim. App. Sept. 21, 1994). He, likewise, unsuccessfully sought post-conviction relief on the basis that trial counsel provided ineffective assistance and that the State failed to provide exculpatory evidence to the defense. *See Ricky Harris v. State*, No. 03C01-9611-CR-00410, 1998 WL 191441 (Tenn. Crim. App. Apr. 23, 1998). The Petitioner sought to reopen his post-conviction proceedings on the basis that the State failed to disclose the name of a witness who was interviewed by the police. The post-conviction court denied relief for failure to state a colorable claim to support reopening the proceedings, and this court *sua sponte* treated the motion as a petition for a writ of error coram nobis and remanded to the trial court. The supreme court, however, determined that this court could not convert the motion to reopen the post-conviction proceedings into a petition for a writ of error coram nobis and reinstated the post-conviction court's denial of the motion to reopen the proceedings. *See Harris v. State*, 102 S.W.3d 587 (Tenn. 2003); *see also Ricky Jerome Harris v. State*, No. E2005-00566-CCA-R3-PC, 2007 WL 4226874 (Tenn. Crim. App. Dec. 3, 2007), *perm. app. granted* (Tenn. Apr. 28, 2009). Later, the Petitioner sought a writ of error coram nobis on the basis of newly discovered evidence related to an alibi witness and to the identity of a person who wrote a 1991 letter to the district attorney's office confessing to the murder. The coram nobis court denied relief, and the supreme court determined that the petition was untimely and that due process did not require tolling the statute of limitations. *See Harris v. State*, 301 S.W.3d 141, 147-48 (Tenn. 2010).

In August 2015, the Petitioner filed the present petition for a writ of error coram nobis. In the petition, he stated that he received, through original trial counsel, a letter from the United States Department of Justice (DOJ) addressed to the district attorney's office regarding the hair analysis conducted in this case.

The July 16, 2015 letter, which was attached to the petition, stated that a review of the hair comparison analysis had been conducted and that "a report or testimony regarding the microscopic hair comparison analysis contain[ed] erroneous statements." The letter explained that the DOJ review was conducted of cases predating December 31, 1999, at which time mitochondrial DNA testing became routine. The review showed that in cases predating mitochondrial DNA, Federal Bureau of Investigation (FBI) laboratory examiners "exceeded the limits of science by overstating the conclusions that may be appropriately . . . drawn from a positive association between evidentiary hair and a known hair sample." The letter stated that the purpose of the review was to ensure that reports and testimony regarding the hair comparison analyses satisfied accepted scientific standards and to identify cases in which the standards were not satisfied. Specific to the Petitioner's case, the letter stated that (1) the analyst's testimony that the evidentiary hair could be associated with a specific person to the exclusion of all others exceeded the limits of science, (2) the analyst's testimony that relative to the likelihood that the questioned hair originated from a particular source or relative to the rareness of the

- 9 -

positive association that could lead the jury to believe the valid statistical weight could be assigned to a microscopic hair association exceeded the limits of science, or (3) the examiner's testimony relative to the number of samples from different persons that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belonged to a specific person exceeded the limits of science. The letter stated that the FBI was available to provide mitochondrial DNA testing of the hair evidence or STR testing of related biological evidence if the hair evidence were no longer available.

The Petitioner argued in his petition that the only possible link between him and the victim had been the single hair found in the Petitioner's car during the "vacuum sweeping" of the trunk and that the then-sheriff had been desperate to obtain an indictment against the Petitioner based upon extensive pretrial publicity.

On October 8, 2015, the coram nobis court entered an order, upon oral motion of the State, to forward the relevant hair evidence to the FBI for further testing. On October 22, 2015, the Petitioner filed a motion to reconsider the order on the basis that the Petitioner did not receive notice of the State's motion and was not provided the opportunity to respond, depriving him of his due process rights. An order resolving the motion is not included in the appellate record.

On October 9, 2015, the State responded to the coram nobis petition that the evidence obtained by the Petitioner from the DOJ regarding the analyst's trial testimony was "newly discovered evidence" that was not available at the time of the trial. The State argued that because the evidence could not have been discovered at the time of the trial, coram nobis relief was not appropriate. The State, likewise, argued that if the information were viewed as "new evidence," the outcome of the trial would not have been different if it had been presented to the jury and that the evidence did not establish actual innocence.

On December 15, 2015, the Petitioner requested the appointment of counsel. He later filed amended petitions for a writ of error coram nobis and a motion to compel documents related to the original hair analysis and to the chain of custody. On March 3, 2016, counsel was appointed, and a status hearing was scheduled for April 14, 2016. The transcript from the hearing is not included in the appellate record.

On May 18, 2016, the coram nobis court entered an order, upon oral motion of the State, for the relevant hair evidence to be forwarded to the FBI for further analysis. The record includes a May 18, 2016 Tennessee Bureau of Investigation (TBI) receipt that shows five pieces of evidence, which included a "slide," a "container with vacuum sweepings," "sweepings from the trunk," "car interior vacuuming," and hair rollers with hair, were released by the Carter County Clerk's Office to the TBI. On October 28, 2016, the Petitioner filed a motion to cease and desist the laboratory hair analysis on the grounds that the chain of custody could not be established by the State and that the

evidence "would all be considered tainted." He requested that the conviction be set aside and that he be released from confinement. An order resolving the motion is not included in the appellate record.

On April 18, 2017, the Petitioner filed a motion that his conviction be set aside and that he be released from confinement. The Petitioner argued that a successor judge could not consider the credibility of the trial witnesses or evidence, that "the two hairs in questions" did not reflect a DNA match, which contradicted trial testimony, and that "withheld letters by the State" established the victim committed suicide and the Petitioner's innocence. On August 2, 2017, the Petitioner filed a motion in limine requesting that the State be prohibited from presenting at the coram nobis hearing any evidence related to DNA evidence obtained during the original investigation and during subsequent analysis because the DNA evidence was destroyed during the State's latest testing, leaving the Petitioner without means to perform independent analyses. The Petitioner also sought to exclude his statements that were made in counsel's absence. The Petitioner also filed a motion to limit the scope of the evidence at the coram nobis hearing to information related to whether the analyst who testified at the trial provided conclusions beyond the analyst's qualifications and what then-science permitted. Orders resolving these motions are not included in the appellate record.

On September 7, 2017, an evidentiary hearing was held. A transcript of the hearing is not included in the appellate record.

The coram nobis court entered an order denying relief on January 31, 2018. In the order, the court discredited the Petitioner's testimony because although the Petitioner denied killing the victim at the coram nobis hearing, the Petitioner admitted killing the victim at a 2014 parole hearing. The court credited the testimony of Dr. Constance Fisher, a DNA analysis expert employed at the FBI laboratory's DNA case unit. Dr. Fisher supervised analysts, who performed various testing on evidence, and she reviewed the analysts' work and "sequence[d] the DNA evidence extracted from the evidence and created DNA profiles." Dr. Fisher concluded that the hair obtained from the rollers and the hair obtained from the trunk were a match.

The coram nobis court determined that the DOJ letter was newly discovered evidence and that the letter sufficiently described with particularity the nature and substance of the evidence. However, the court found that the DOJ letter did not contain "credible" evidence based upon Dr. Fisher's conclusions, which established that the hair found in the trunk of the Petitioner's car and the hair obtained from the victim's home had the same DNA profile. As a result, the court denied relief on this basis.

The coram nobis court, though, also determined that even if the DOJ letter were credible newly discovered evidence, the outcome of the trial would not have been different if the evidence had been presented at the time of the trial. The court reviewed

the trial transcript and considered the witness testimony before finding that the outcome of the trial would not have been different even if the hair comparison analysis testimony and evidence were excluded from the trial. The court found overwhelming circumstantial evidence supporting the conviction and determined that the hair comparison evidence was cumulative. This appeal followed.

The Petitioner contends that the coram nobis court erred by denying relief. He argues that he was not provided the opportunity to have the evidence independently analyzed and that Dr. Fisher's testimony violated Tennessee Rule of Evidence 901 and the Petitioner's due process rights. He asserted that the chain of custody was broken when the analyst who performed the DNA analysis did not testify at the evidentiary hearing. The Petitioner also contends that the coram nobis court reached an erroneous conclusion by determining that the outcome of the trial would not have been different had the hair comparison evidence not been presented to the jury. The State responds that the Petitioner has waived appellate review because he failed to prepare an adequate record on appeal. We agree with the State.

The appellate record does not contain a transcript of the coram nobis hearing. The Petitioner has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). This includes the obligation to have a transcript of the evidence or proceedings prepared. *See* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). The Petitioner has failed to prepare an adequate record, and, as a result, he is not entitled to relief.

Based upon the forgoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

- 12 -